**CHANNEL 16 OF RHODE ISLAND, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION.**

No. 23399.

United States Court of Appeals, District of Columbia Circuit.

Argued June 11, 1970.

Decided Feb. 19, 1971.

Mr. David Meyers, Washington, D. C., with whom Mr. Benedict P. Cottone, Washington, D. C., was on the brief, for appellant.

Mr. D. Biard MacGuineas, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee. Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and MATTHEWS *, Senior Judge, United States District Court for the District of Columbia.

MATTHEWS, Senior District Judge:

Channel 16 of Rhode Island, Inc. (hereafter Channel 16), permittee of television broadcast station WNET on Channel 16 at Providence, Rhode Island, seeks review of the Memorandum Opinion and Order of the Federal Communications Commission released April 8, 1969, denying an application of Channel 16 for an extension of time within which to complete construction of such station, and a Memorandum Opinion and Order released July 17, 1969, denying a petition for reconsideration.

It is asserted by Channel 16 that the Commission erred (1) in finding that Channel 16's failure to reactivate its formerly operative UHF station was occasioned by causes under Channel 16's control; (2) in holding that there were no issues of material fact requiring an evidentiary hearing; (3) in finding that the circumstances set forth by Channel 16 regarding proposed competitive CATV operations did not constitute "other matters sufficient to justify an extension;" and (4) in refusing to consider the activities and expenditures of Channel 16 looking toward reactivation of Channel 16 as "other matters sufficient to justify an extension."

We think the Commission acted arbitrarily, capriciously and without rational basis in denying the requested extension. Accordingly, we reverse and remand the case.

In the spring of 1953, Channel 16 was granted a permit to construct a UHF television station to serve Providence, Rhode Island. The station went on the air under a special temporary authorization in 1954 pursuant to which Channel 16 operated Station WNET for some 17 months. In July of 1955 broadcasting was suspended. A statement setting forth the reasons for the suspension was filed with the Commission on July 5, 1955, wherein Channel 16 expressed its "reluctance in taking this step" but asserting inability to compete with two

---

* Sitting by designation pursuant to Title 28 U.S.Code, Section 294(c).

VHF stations.[1] Thereafter, Channel 16 applied for six-month extensions of its permit which were routinely granted until the application filed in September 1956. The commission did not act on this application until 1965.

During the 1950's the Commission pursued a very liberal policy in granting extensions of UHF permits. The Commission presented the history and rationale of this policy to the Court in MG–TV Broadcasting Company v. F. C. C., 133 U.S.App.D.C. 54, 59, 408 F.2d 1257, 1262 (1968) wherein the court recounted:

> "In the early days of UHF, the Commission states, extensions were 'almost automatically granted upon the mere allegation that it was economically unfeasible to construct at the time.' With improving economic conditions, and the passage in 1962 of the all-channel receiver legislation [2] the Commission decided that it would no longer accept the excuse of economic unfeasibility alone."

This more rigid attitude toward extending permits emerged in Thames Broadcasting Corp., 29 F.C.C. 1110 (1960). There 27 applicants were seeking time extensions on their construction permits, basing their failure to construct on the premise that economic and other conditions rendered UHF operations unsuccessful at that time. In support of this they pointed to the failure of UHF stations in areas served by VHF stations, the inability of the public to receive UHF signals on their television sets, and the fact that the Commission had made no final determination concerning the future of UHF. All of the applicants had declared that they did not intend to commence construction. The Commission determined that these were matters "solely within the business judgment of the individual applicant," and denied all but three of the applications. 29 F.C.C. 1113. Two of these three applicants had permits for UHF stations in cities where additional VHF channels might be placed as a result of the rule-making proceedings then before the Commission. As to these two, the Commission believed it to be in the public interest to defer action until the rule-making proceedings were concluded. The third applicant had a partially built station; it had expended over $70,000, had purchased a tower, and had an agreement for equipment on which 25 percent of the price had been paid, and had exercised an option and acquired land. The Commission felt it would be in the public interest to grant the time extension to this applicant.

Commissioner Hyde dissented as to the 24 applications being denied, saying:

> "The majority concludes that these applicants have been guided by matters of business judgment and not impeded by causes beyond their control. However, it is clear from the record that the cardinal factor influencing their decisions not to construct has been the absence of a definitive Commission determination concerning the future of UHF television. Thus, in the circumstances, I believe it inequitable and unwise to so strictly construe section 319 of the Communications Act and section 1.323 of the Commission's rules as to reach the result here enunciated." 29 F.C.C. 1115.

Commissioner Lee dissented in whole "pending Commission resolution of the UHF-VHF problem." 29 F.C.C. 1115.

The first response to Channel 16's application of September 1956 was a letter

---

1. Both the Senate and House Reports on the "All-Channel Receiver Law" indicated that roughly one hundred UHF stations had gone into operation and had subsequently buckled under the intense competitive pressure of VHF stations. The Senate Report summed up the bleak UHF picture by saying: "Very few UHF stations have dared to go on the air; of those that have, 100 had to give up and are now dark." 47 U.S.C. 303(s), Pub. L. 87–529, July 10, 1962, H.R.Rep.No. 1559 and S.Rep.No.1526, 87th Cong., 2d Sess. (1962).

2. 47 U.S.C. § 303(s).

from the Commission dated November 4, 1964, stating:

"Inasmuch as the failure to complete construction is apparently due to your voluntary decision not to proceed based on your judgment that the proposed station could not succeed financially under present economic conditions, it would appear that you will, at the most, be entitled to an oral argument on the question of whether your failure to complete construction as a result of such voluntary decision constitutes either causes not under your control, or the requisite showing of other matters sufficient to justify the extension, within the meaning of Section 319(b) of the Communications Act of 1934, as amended, and Section 1.534(a) of the Commission's Rules." Appendix, p. 2.

Channel 16 responded that it wished to prosecute its application and desired oral argument. Thereafter, the Commission ordered a consolidated oral argument on this and a number of other pending applications for extensions of permits by UHF permittees whose stations were not on the air.

The oral argument was held on May 13, 1965. The discussion revolved around the intention of Channel 16 to go back on the air and the concern of the Commission as to when this would be. Channel 16 pointed to two major obstacles regarding its time schedule. The first was based on the knowledge that CATV was "bristling" all over Rhode Island, and Channel 16 was concerned with the dangers and threats of CATV to UHF operations and the absence of any general policy by the Commission on the franchising of local CATV. The second problem was the need of Channel 16 to go to

increased power, which necessitated a modification permit. Channel 16 emphasized that the time element for Commission approval of a modification permit was an unknown factor within the control of the Commission. At this juncture, the Commission posed the question as to whether Channel 16 would make a commitment to construct within six months of the grant of that application. Channel 16 replied that if the Commission conditioned its grant of the construction permit for increased power on the provision that it have its station operational within six months, then "that would be a condition and will be a commitment in the light of circumstances as they then appear." [3] But Channel 16 qualified this statement by referring to the possibility that future Commission policies might permit a substantial CATV system in Providence, under which circumstance Channel 16 might have to change its mind. It "might have to give up the permit or might have to ask [the Commission] to hold up somewhat on the commitment, recognize that there are reasonable circumstances that might cause [Channel 16] in good faith to change that original commitment." [4]

Following this consolidated oral argument, on June 17, 1965, the Commission released a Memorandum Opinion and Order in Joe L. Smith, Jr. et al.,[5] in which Channel 16's application for extension was granted. The Commission denied several applications for extension of construction permits where the applicants had made no firm commitments to complete construction, giving as the primary reason for their inaction that UHF operation at the time would be economically unfeasible because of VHF competition and the inability of sets owned by the viewing public to receive UHF signals.

3. Appendix, p. 15.

4. Appendix, p. 15. There has been some confusion concerning Channel 16's position taken at this oral argument. In its Memorandum Opinion in Vision Cable of Rhode Island, Inc., 10 F.C.C.2d 954 (1967) the Commission referred to this oral argument and stated that Channel 16

had therein unconditionally committed itself to completion of construction within six months after the grant of its application for modification. The transcript of this oral argument, as quoted above, appears to be to the contrary.

5. 5 P & F Radio Reg.2d 582 (1965).

Quoting from *Thames, supra*, the Commission said:

> "We believe that none of these applicants, all of whom at the time they obtained their construction permits stated they would construct the subject station and who now substantially state that they do not intend to commence construction, have demonstrated that their failure to construct was due to causes not under their control. The applicants have failed to satisfactorily demonstrate that they could not have physically constructed their stations as contemplated by section 319 of the Act * * * [W]e emphasize that the Commission is not compelling the applicants to construct facilities for which they have applied. On the other hand, we do not feel that it is in the public interest to have these construction permits pending when the applicants have no intention of going ahead with construction in the near future. It is the applicants' choice to build or not. Since they do not choose to build and the reasons they have advanced do not involve causes beyond their control, their applications * * * should be denied." 5 P & F Radio Reg.2d 589.

Regarding the inability of the television sets owned by the public to receive UHF signals, the Commission continued:

> "A permittee or licensee who voluntarily postpones construction or ceases operation because of economic factors exercises his independent business judgment, and such postponement or cessation is clearly due to causes under the control of the permittee or licensee." 5 P & F Radio Reg.2d 590.

Nonetheless, out of some 18 applications for time extensions the Commission granted 13, among which was Channel 16's (provided Channel 16 filed its application for modification within two months and completed construction within six months after the Commission acted on the application) on the theory that this furthered the Commission's objective of instituting additional UHF television service. A modification application was filed by Channel 16 in August of 1965.

While this application was pending, on June 5, 1967, Vision Cable Company of Rhode Island (hereafter Vision Cable) gave notice pursuant to the Commission's Rules [6] of its intention to commence CATV operations in a number of communities within the Providence and Boston television markets. Joining with WPRO-TV, Providence, Rhode Island (a licensee) and WTEV-TV, New Bedford, Massachusetts (a permittee), Channel 16 filed a pleading in opposition thereto, urging an evidentiary hearing on Vision Cable's proposal by reason of the potentially destructive competition to Channel 16.

In Vision Cable of Rhode Island, Inc., adopted December 13, 1967,[7] the Commission referred to Footnote 69 of the Second Report and Order [8] wherein it had recognized that special relief might be appropriate where there is Grade B overlap between two major markets, and it said:

> "We are concerned here with the potential impact of carriage—in the Providence market—of the Boston and Worcester signals upon the activation of Channel 16. In 1965 after hearing an oral argument * * * Channel 16 made a specific and unqualified commitment to file an application within a specified period of time and to have an operative station on the air within six months of grant. Only recently, pursuant to an informal inquiry from the Commission, Channel 16 reaffirmed this commitment. Additionally, on November 7, 1967, Channel 16 amended its application for a change in its proposed facilities * * * These circumstances persuaded us of the likelihood of the near-term activa-

6. 47 C.F.R. § 74.1105.

7. 10 F.C.C.2d 954 (1967).

8. Second Report on CATV Regulation, 2 F.C.C.2d 725, 6 P & F Radio Reg.2d 1717 (1966).

tion of that channel. Initiation of petitioner's proposal now would inject an unknown factor into this equation.

"We do not intend, however, to permit Channel 16 to unduly delay activation of its station. We intend to process the pending application expeditiously and we expect Channel 16 to meet its prior unqualified commitment to complete construction of the station within six months after a grant of the application. At that time we will again review the pending CATV proposals." 10 F.C.C.2d 955.

The Commission then directed that action on Vision Cable's proposal be held in abeyance for six months.

Thereafter, on January 25, 1968, the Commission granted Channel 16's application for modification of its construction permit, and pursuant to the terms of the Order in *Joe L. Smith, Jr., supra,* the construction permit was extended to June 25, 1968.

On February 8, 1968, Vision Cable filed a petition for review of the Commission's Order of December 13, 1967, in the United States Court of Appeals for the First Circuit asking that the court direct the Commission "to permit immediate activation of its CATV systems."[9] Channel 16 intervened. However, after Vision Cable filed its brief in that suit, it became apparent that Vision Cable was not seeking a court determination requiring the commission to permit activation of the CATV system, but rather it sought a decision that a Commission hearing be held to resolve the question. Since this was what Channel 16 was also urging on the Commission,[10] Channel 16 then withdrew from the First Circuit litigation.

It was in this setting that on June 12, 1968, Channel 16 applied for extension of its modified permit, enclosing therewith a statement of its recent efforts toward reactivation of station WNET. This statement dealt, among other things, with negotiations for the purchase of additional equipment, and an attempt to get other companies to participate in financing in order to minimize the risk.

The Commission answered this application on July 31, 1968, stating that it appeared that Channel 16's delay was due to its voluntary decision to postpone construction because of economic and other considerations, that it also appeared that Channel 16 lacked sufficient funds to finance construction of the station, and that Channel 16's request for extension of its construction permit until such time as the Commission reached a decision on Vision Cable and CATV was contrary to its prior commitment to complete construction within six months of the grant of its modification permit. The Commission concluded that the application would not be granted, but advised that Channel 16 was at least entitled to oral argument.

Channel 16 responded on September 3, 1968, that it desired to prosecute its application, and again requested a full evidentiary hearing, pointing out that the Commission's statement that Channel 16 had made a "voluntary decision not to proceed, because of economic and other considerations" was a contradictory statement, since the decision was based on the identical considerations which the Commission itself had declared might stifle potential development of UHF. And, since the Commission raised a question regarding its financial ability, Channel 16 assured the Commission that it would be prepared to show at the evidentiary hearing that it was fully capable of meeting its financial responsibilities in the absence of CATV competition. Attached to this response was a letter and check evidencing the purchase from RCA of equipment in the amount of $725,800 with the president's personal

9. Petition for Review, p. 10, Vision Cable Co. of Rhode Island, Inc. v. U. S. A. and F. C. C., Case No. 7078, USCA, First Circuit.

10. Channel 16 had again filed a pleading with the Commission seeking an evidentiary hearing and action on Vision Cable's proposal before reactivation of its UHF station which could be destroyed by CATV competition.

guarantee, and a 2% downpayment in the amount of $15,256.

Immediately thereafter, on September 5, 1968, the Commission ordered an evidentiary hearing on Vision Cable's proposal, principally on the issue of whether its CATV operations would have a significantly dampening effect on the development of Channel 16. Channel 16 was made a party to that hearing. On motion of Vision Cable, the First Circuit Court of Appeals dismissed the pending suit by reason of mootness. Instead, however, of the Commission getting under way the evidentiary hearing it had ordered on Vision Cable's proposal, the Commission on December 16, 1968, suspended the hearing, pending the outcome of proceedings which had been initiated upon proposed amended rules governing CATV operation throughout the country.

On January 17, 1969, the Commission rejected Channel 16's request for a full evidentiary hearing, and scheduled its application for extension for oral argument, "before the Commission *En Banc*" [11] on the issue of sufficiency of reasons supporting such request. Four Commissioners heard this oral argument on February 24, 1969.[12]

At the hearing, Channel 16 began by reminding the Commission that there have been two commercial VHF channels, two commercial UHF channels, and one educational UHF channel that have been assigned to Providence. Channel 16 is the only commercial UHF station that has ever been in operation, and no one has ever applied for the other commercial UHF station in the 15 years the channel has been available. Channel 16 then pointed out that it was operational for some 17 months, but succumbed to VHF competition sustaining losses of between $400,000 and $500,000. Nevertheless, its intention to go back on the air has never waivered. The idle studio and transmitter buildings and the tower have been kept available for reactivation of the station, and Channel 16 has borne the expense of maintenance, repair, taxes, tower lighting and painting throughout the 13 years the channel has been dark. Further evidence of its bona fide intention of going back on the air was the purchase in 1967 of an additional 20 acres adjacent to Channel 16's present site for construction of a 1,000 foot tower and the purchase in 1968 of equipment from RCA. But the heart of Channel 16's argument to the Commission was in regard to the matter of Rhode Island CATV activity, and Vision Cable in particular. The transcript of the hearing of May 13, 1965, was produced in an attempt by Channel 16 to clear up the obvious misunderstanding of an "unconditional commitment" allegedly made at that time. Channel 16 continued to press for an evidentiary hearing on the factual issue of the effect of CATV on UHF in the Providence Market, before the Commission acted on the application for extension of its permit.

In an opinion released April 8, 1969, the Commission denied the extension, Commissioner Cox dissenting. Subsequently, the Commission denied Channel 16's petition for reconsideration.

■ With this background, we turn now to the standards set out by Congress, as well as by the Commission under its rule-making authority, which specify the conditions under which extensions of construction permits will be granted. The Communications Act of 1934, as amended, 47 U.S.C. § 319(b) provides:

"Such permit for construction shall show specifically the earliest and latest dates between which the actual operation of such station is expected to begin, and shall provide that said permit will be automatically forfeited if the station is not ready for operation within the time specified or within such further time as the Commission may allow, unless prevented by causes not under the control of the grantee."

11. Appendix, p. 46.

12. Robert T. Bartley; Robert E. Lee; Kenneth A. Cox; Nicholas Johnson.

The Commission's Rules, 47 C.F.R. § 1.534(a) further provide:

"Application for extension of time within which to construct a station shall be filed on FCC Form 701. The application shall be filed at least 30 days prior to the expiration date of the construction permit if the facts supporting such application for extension are known to the applicant in time to permit such filing. In other cases, an application will be accepted upon a showing satisfactory to the Commission of sufficient reasons for filing within less than 30 days prior to the expiration date. Such applications will be granted upon a specific and detailed showing that the failure to complete was due to causes not under the control of the grantee, or upon a specific and detailed showing of other matters sufficient to justify the extension."

Thus, the burden is on the applicant to show that failure to complete construction of its UHF station within the time specified by the permit was due to causes not under its control or to show other matters sufficient to justify the extension. We are of the opinion that Channel 16 has sustained this burden.

We have studied carefully the Commission's Memorandum Opinion of April 8, 1969, from which stems this appeal. First, the Commission dismissed the request for a full evidentiary hearing by simply stating that there were no questions of fact which required hearing for resolution. Channel 16 argues that its previously questioned financial ability to proceed is a material issue of fact. This is not mentioned in the Commission's Opinion. Channel 16 says that whether it made an "unqualified commitment" to construct its station within a specified time is a material issue of fact. The Commission's Opinion speaks only of an "alleged unqualified commitment" but there is no reliance on this point as a basis for its decision. Lastly, although Channel 16 does not claim a statutory right to a full evidentiary hearing, it points out that the Commission has uni-

formly regarded questions as to the economic effects of CATV operation on UHF stations as substantial issues of material fact and ordered hearings thereon, citing Cosmos Cable Corp., 6 F.C.C. 2d 223 (1966); United Transmission, Inc., 6 F.C.C.2d 786 (1967); American Television Relay, Inc., 6 F.C.C.2d 837 (1967); Cable Vision, Inc., 7 F.C.C.2d 920 (1967); Midwest Television, Inc., 13 F.C.C.2d 478 (1968). However, the Commission in *Midwest* was explicit that the evidentiary hearing in that proceeding (as well as other major market proceedings) was not an adjudication in the sense that it was to determine either past or present conduct or liabilities. Rather, the object of the hearings was to elicit sufficient information to permit the Commission to make an informed policy judgment as to the best future course in the market involved.

It was this objective which prompted the Commission on September 5, 1968, to order the hearing in Vision Cable Co. of Rhode Island, Inc., 14 F.C.C.2d 654 (1968), to which Channel 16 was made a party (which hearing was later suspended). The Commission said:

"Our rules and policy as set out in the Second Report and Order are based on only on the need for protection from CATV competition of existing UHF independent stations; they are founded as well on the public interest in preserving realistic potential for new UHF independent stations. Midwest Television, Inc., 13 F.C.C.2d at 494–495. That potential is present here since Channel 16 will remain assigned to Providence for future use even if the present permittee ultimately chooses to forfeit its permit. In the light of our present policies, and particularly our recent decision in Midwest, *supra,* adopted June 26, 1968, we believe that a hearing is called for to determine whether the Vision Cable proposal would have a significantly dampening effect on future interest in UHF Channel 16. This issue will, therefore, be the subject of hearing." 14 F.C.C.2d 655.

Thus, the Commission recognized that the evidentiary hearing which Channel 16 had long sought was called for under the circumstances. Nevertheless, some months later pursuant to the procedure specified in the Commission's Notice of Proposed Rulemaking and Notice of Inquiry, 15 F.C.C.2d 417, released December 13, 1968, all top 100 market CATV hearings, including the Providence proceedings, were halted and have remained frozen.

It is our understanding that at the conclusion of the rule-making procedures a policy determination may be forthcoming by the adoption of proposed amendments by the Commission. If these amendments are not adopted, then the hearings which have been suspended will be resumed. Under these circumstances we do not think it appropriate to order an evidentiary hearing while these rule-making procedures are in progress. It remains to be determined whether Channel 16 should be permitted to maintain its construction permit without completing construction or going on the air until such time as the extent of CATV activity in the Providence area is finally determined.

The denial of Channel 16's application for extension was grounded solely on the basis that Channel 16's refusal to complete construction of its UHF station pending a determination of the Commission's position on CATV and Vision Cable was an exercise of its independent business judgment. The Commission stated:

"[T]he Commission has consistently taken the position that 'a permittee or licensee who voluntarily postpones construction or ceases operation because of economic factors exercises his independent business judgment, and such postponement or cessation is clearly due to causes under his control.' Joe L. Smith, Jr., Inc., FCC 65–528, 5 RR 2d 582, 589–590 (1965). See also, The Thames Broadcasting Corp., et al., 29 FCC 1110, 1113 (1960). Since Channel 16's determination to postpone indefinitely the reactivation of station WNET did not result from circumstances beyond its control and no other adequate basis for extending its permit has been advanced, the application for extension must be denied."

■ The Commission has strictly construed § 319(b), holding that "causes not under the control of the grantee" be limited to the physical inability to complete construction timely, such as the inability to obtain equipment, as suggested in the opinion under review, and that a policy determination by the Commission, although admittedly beyond the "control" of a grantee, is not such a "cause." These same words "causes not under the control of the grantee" are contained in § 1.534(a) of the Commission's own Rules, and the Commission's interpretation of its Rules is entitled to great weight. Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

The usual situations where the rule has been applied by the Commission have involved permittees who have never commenced or completed construction of the station authorized and any intention to do so has been highly questionable. The Commission believes that it would thwart its objectives in furthering UHF communications to allow idle permits to lie around when the permittees are simply stalling for time to permit greater UHF set saturation or a more favorable market situation.

■ While we agree with these general principles, we do not think the circumstances of Channel 16 present the "usual situation."

■ We need not disturb the Commission's holding that Channel 16's failure to reactivate its station WNET did not result from circumstances beyond its control because the issue designated herein includes the question of whether Channel 16 has shown "other matters sufficient to warrant further extension." We think that the circumstances of this case, considered with the continued uncertainty as to the CATV situation in the

Providence area, constitute such "other matters."

The advent of CATV has posed innumerable difficult problems across the country. A good deal of time has passed while the Commission has been in the process of resolving these problems and developing a firm policy in this field. Nonetheless, the uncertainty is due to inaction by the Commission and only the Commission can resolve it. It is understandable that Channel 16 and those similarly situated are reluctant to commit large sums of money until they have a clear indication of what the Commission's cable policy is going to be. It is simply not realistic to say that the delay of Channel 16 in completion of its station is due only to economic considerations alone or the exercise of its business judgment. Channel 16 has already been the victim of VHF. It had a UHF station on the air for 17 months, but competition from VHF forced it to close down and to sustain heavy losses. In spite of this, Channel 16 has amply proved its intention of getting back on the air by making further investments and commitments in the improvement of the station. It would not be fair to wipe out this investment before the Commission decides what it is going to do.

The Commission's rules allow for extensions where the applicant has shown "other matters sufficient to justify the extension." Inasmuch as the Commission has committed itself to the institution of additional UHF television service, it has granted particular applications for extension when it determined it was in the "public interest" and would achieve these objectives. We cannot see how cancelling the permit of Channel 16 is consistent with the objectives of the Commission in further UHF development. Not only is there no one waiting for this permit who would implement

UHF service to the Providence market more quickly than Channel 16, there is an additional UHF station assigned to Providence which is vacant, and for which no one has ever applied in the 15 years the channel has been available.

We have considered the possibility that the Commission ruling that Channel 16 has not presented matter sufficient to warrant further extension may be supported by an implied premise that it is fair and reasonable to ask Channel 16 to construct now, even though the FCC has not resolved its CATV policy, because otherwise the public interest in communications is disserved. But in view of the manifest unfairness to permittees in the position of Channel 16, this conclusion is without substantial support in the record unless some basis is presented to support the view that with the denial of Channel 16's extension there is at a minimum a reasonable possibility that some other applicant will step forward and make a meaningful unconditional commitment to build even though the CATV policy of the FCC remains in limbo.

In denying Channel 16's present application for extension the Commission has relied upon its holding in *Joe L. Smith, Jr., Inc., supra.* Channel 16 was a party litigant in *Smith* and it raised therein substantially the same issue regarding CATV as it raises in the present suit. The Commission granted the extension in *Smith.* It is difficult to conform that ruling with the denial of Channel 16's extension in the present suit.[13]

The Commission has also relied on the *Thames* case, *supra.* In *Thames,* the Commission felt that the public interest would best be served by deferring action on two UHF applicants whose stations were in cities threatened with additional VHF channels, pending the result of rule-making proceedings then before

---

13. In granting Channel 16's extension in *Smith,* the Commission may have understood Channel 16's position to be an unconditional commitment to construct, and on that basis distinguished it from those applications for extension which the

Commission denied. However, the Commission has not relied on a breach of Channel 16's alleged "unconditional commitment" as a ground for denial of the present application for extension, and we do not consider it.

the Commission, and excepting a third applicant from the rule because of his considerable investment in a partially built station. We think the circumstances of Channel 16 bring it squarely within both of these exceptions.

The request for additional time as warranted by circumstances resembles the administrative situation in the case of waivers. As we pointed out in WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969), regulations properly contain waiver provisions as a safety valve. They cannot be invoked without a strong factual showing. When there is such a showing the agency must consider whether its general policy should be waived, or better, perhaps should be altered with a general albeit partial modification. Here, Channel 16 has made a strong factual showing. There is no discussion whatever by the FCC of the policy considerations beyond a wooden recital of its "beyond control" litany. There are other instances, as appears from our discussion of *Joe Smith* and *Thames,* in which the kind of policy considerations relied on by Channel 16 were held to warrant equitable consideration. In these circumstances the FCC's rigidity unaccompanied by meaningful consideration of the particular or partial problems contemplated by its own safety valve regulation, cannot be sustained as consistent with the Rule of Law.

A policy determination by the Commission regarding the Providence market will come to fruition in one of two ways: the Commission will adopt proposed amendments at the conclusion of its rule-making procedures, or, if it does not adopt proposed amendments, then the evidentiary hearings now under suspension will be continued.

While the views set forth in this opinion lead naturally to the conclusion that Channel 16 should be granted an extension,—for a period ending six months after the Commission adopts proposed amendments, or six months after the conclusion of the suspended hearings—there are considerations rooted in the nature of this court's supervisory review function why we do not issue a mandate directing such extension. It may be that even though such an extension is called for now, future developments will require a modification; we think the Commission should have the authority to make such modification without further application to this court. It is also possible that the Commission has reasons that were not expressed which indicate that such extension is not sound as of the present time. Accordingly the court's judgment will vacate the order appealed from and remand the case to the Commission with directions to reconsider the matter in the light of the views set forth in the court's opinion.[14]

So ordered.

---

14. *See* Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. ——, 439 F.2d 584, and sources cited therein

(January 7, 1971); WAIT Radio v. Federal Communications Commission, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969).