**NEW ORLEANS CHANNEL 20, INC.,
et al., Appellants,**

**v.**

**FEDERAL COMMUNICATIONS
COMMISSION, Appellee.**

No. 86–1384.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 10, 1987.

Decided Oct. 6, 1987.

John E. Fiorini, III, with whom John R. Feore, Jr., Washington, D.C., was on brief, for appellants.

John P. Greenspan, Counsel, F.C.C., for appellee. Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and David Silberman, Counsel, F.C.C., were on brief, for appellee. Roberta L. Cook, Counsel, F.C.C., Washington, D.C., also entered an appearance for appellee.

Before SILBERMAN, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Appellants challenge an FCC decision terminating their right to construct and operate a new television station in New Orleans, Louisiana. The FCC awarded the construction permit in 1980. New Orleans Channel 20, Inc. ("NOC") obtained the permit by assignment in 1983. As of 1985, construction had yet to begin. NOC sought to transfer the permit to LeSea Broadcasting, Inc. ("LeSea"), but the FCC rejected the proposed assignment. The Commission concluded that permit holder NOC had not made a "specific and detailed showing" that the failure to construct the station was due to causes beyond the permittee's control. 47 C.F.R. § 73.3534 (1985). Appellants do not contest this finding. The FCC also concluded that LeSea, the proposed assignee, failed to demonstrate that its plans for constructing the station were sufficiently definite to "justify the extension" of the construction permit. *Id.* Appellants cite three instances in which the agency permitted an extension on allegedly similar facts and argue the present denial violates the agency's obligation to treat like cases alike.

Because the agency's decision in this case was neither arbitrary or capricious, nor clearly contrary to a line of decisions in other cases, we affirm the FCC's order and opinion.

## I. BACKGROUND

In October 1980, the FCC awarded the WULT–TV, Channel 20 construction permit to a joint venture known as New Orleans Area Telecasters ("NOAT"). The permit was to expire on April 10, 1982 according to the following terms:

[The permit] shall be automatically forfeited if the station is not ready for operation within the time specified or within such further time as the Commission may allow unless completion of the station is prevented by causes not under the control of the permittee.

Brief for Appellee at 3.

NOAT made absolutely no progress in starting construction. Ultimately, in March 1983, the FCC approved transfer of the permit to the NOC group, which was consummated in June 1983. Notwithstanding two extensions, NOC failed even to begin construction. Consequently, in May 1984, NOC submitted a letter stating that due to the "drain" on its "time and resources" and its "lack of success in finding a suitable [transmitter] site," it had decided to assign the permit to a better qualified entity, anticipating the assignment application to be filed before May 31, 1984. Joint Appendix ("J.A.") at 76–77.

Two months later, on July 10, 1984, NOC filed its third extension request (the appli-

cation on appeal in this case) seeking a further six-month extension in order to permit the assignment to LeSea and give it time to complete construction of Channel 20. LeSea is controlled by the Lester Sumrall family, who also controls the Lester Sumrall Evangelistic Association, Inc., the licensee of two operating television stations. In the July 10 filing, NOC stated it was about to sign an assignment agreement with a party as yet unnamed [LeSea] who had authorized the representation that it was in the process of acquiring a new transmitter site (to be specified in the near future) and that it would begin construction immediately after the assignment, "mak[ing] every effort" to complete construction as soon as possible.

In supplemental filings on December 13, 1984, J.A. at 122, and January 15, 1985, J.A. at 119, LeSea by letter represented that it had actually secured the transmitter site and would soon file an application to modify Channel 20's permit, placed a contingent $2.5 million equipment order, located a suitable studio site, reached agreements in principle for the station's Operations Manager and Chief Engineer, and estimated that it would commence operation 210 days following acquisition of the permit. The FCC emphasizes that "[n]o documents were provided by LeSea to support these claims." Brief for Appellee at 10.

On June 4, 1985, the Commission's Mass Media Bureau denied NOC's extension request and, in addition, cancelled the construction permit, deleted the WULT call sign, and dismissed the assignment application as moot. *New Orleans Channel 20, Inc.*, 100 F.C.C.2d 1401 (1985). The Bureau found that NOC did not have a transmitter site and had not begun construction or even ordered equipment, notwithstanding a four-year delay since the award of the permit to predecessor NOAT or the two extensions to NOC. The Bureau noted that extension applications are not automatically granted even if coupled with an application to assign the permit to a party representing its desire to complete construction. The Bureau concluded that it could not find that construction had been prevented by causes beyond NOC's control or that there were other matters warranting an extension.

NOC and LeSea appealed to the Commission. The agency rule applicable to NOC's extension request, though subsequently modified, read in pertinent part:

> [An application for extension of construction permit] will be granted upon a specific and detailed showing that the failure to complete was due to causes not under the control of the grantee, *or* upon a specific and detailed showing of other matters sufficient to justify the extension.

47 C.F.R. § 73.3534 (1985) (prior to substantial revision effective December 10, 1985) (emphasis added). The FCC in its brief concedes that the "or" must be read disjunctively—a party can justify its failure to complete *or* show that "other matters ... justify the extension." Brief for Appellant at 19.

On the first count—NOC's failure to complete—the Commission concluded that business considerations, not causes beyond NOC's control, explained the inaction:

> [NOC's] continued lack of [a] site was not attributable to the actual, physical unavailability of potential transmitter sites, but to Glazer's [Mutual's principal] business decisions to reject sites as undesirable or too expensive and his failure to reach agreements with owners of potential sites.... [Glazer's] statements detail various business judgments made by [him] in rejecting sites on which WULT-TV's transmitter could have been constructed.

104 F.C.C.2d at 313. NOC does not challenge this finding on appeal.

Thus the disposition of this case turns on the FCC's evaluation of LeSea's qualifications. Appellants argued that the pendency of the assignment application was an "other matter[ ]" warranting the extension. The FCC catalogued the representations made by LeSea but concluded that the proposed assignee had "provided no information to demonstrate the firmness of [the equipment] order" and no "information to show that its putative transmitter or studio

sites are actually available." 104 F.C.C.2d at 314. After referring to "the record in this case," the FCC concluded:

Assignment of the permit likely would not result in the expeditious construction and operation of WULT–TV, or contribute to an overall environment in which construction permit holders are encouraged to make and fulfill realistic commitments, thereby bringing service to the public at the earliest possible date. In such a situation, it is preferable to cancel the authorization, thereby opening the door for other qualified applicants.

*Id.*

The Commission rejected appellants' equal treatment claim by distinguishing on the facts the grant of extensions for new television construction in Tulsa, Oklahoma and Kalamazoo, Michigan and the restoration of broadcast service for a licensed station in Crossville, Tennessee. Appellants claim the factual distinctions articulated by the FCC are illusory.

## II. DISCUSSION

■ We base our analysis of the FCC's denial of the extension and cancellation of the station's call letters on a two-step inquiry. First, did LeSea make *"a specific and detailed showing* of other matters sufficient to justify the extension"? 47 C.F.R. § 73.3534 (1985) (emphasis added). Second, was the agency's unfavorable evaluation of LeSea's commitment arbitrary and capricious or an abuse of discretion? This analysis puts LeSea to a double burden, but one that is well established in circuit precedent. *See, e.g., WAIT Radio v. FCC [II]* :

An applicant for waiver [of FCC rules] faces a high hurdle even at the starting gate.... On its appeal to this court, the burden on [the permit holder] is even heavier. It must show that the Commission's reasons for declining to grant the waiver were so insubstantial as to render that denial an abuse of discretion.

459 F.2d 1203, 1207 (D.C.Cir.1972) (internal citation omitted); *cf. Channel 16 of Rhode Island, Inc. v. FCC,* 440 F.2d 266, 276 (D.C.Cir.1971) ("The request for additional time as warranted by circumstances resembles the administrative situation in the case of waivers.").

In this case, the regulation requires a petitioner to overcome a high initial hurdle by requiring "a specific and detailed showing." The showing made by LeSea consisted of representations made in four brief documents: NOC's initial recitation of the unnamed assignee's undertakings, J.A. at 82; a two-page sworn statement submitted by Sumrall in August, J.A. at 84–85; his two-page December follow-up, J.A. at 123–24; and NOC's brief two-paragraph recital in January on LeSea's behalf, J.A. at 119. In addition, LeSea submitted the engineering specifications for a new transmitter site on FCC Form 301, J.A. at 97–118.

The central deficiency of these filings, as noted by the FCC, is the absence of specificity. 104 F.C.C.2d at 314–15. A party contingently ordering $2.5 million of television equipment and "in a position" to make the order final one to two days after receiving the construction permit should presumably not find it difficult to provide the FCC an order and invoice with full specifics. LeSea has never explained its failure to submit this obvious documentation, nor did it provide other typical indicia of firmness such as a down payment. *Id.* at 314. Furthermore, LeSea only promised to "make every effort" to build WULT promptly. By contrast, in the Kalamazoo case, the party "unequivocally committed" to complete the station if awarded the construction permit. This calls into question the ostensible firmness of the NOC construction schedule. Finally, in the eyes of the FCC, no specifics were provided demonstrating that the "putative transmitter or studio sites [were] actually available." *Id.* at 315. As to the transmitter, LeSea has an effective rebuttal—the rules at the time did not require an independent representation that the site was available; rather, this was assumed from the fact of the detailed engineering filing. Brief for Appellants at 19 n. *. As to the studio, however, LeSea again failed to specify the location or provide draft lease agreements.

Even assuming the FCC's judgment were questionable, appellants must demonstrate to this court that the FCC abused its discretion in reaching the conclusion that the filings were deficient as a matter of law. As experienced readers of applications, the FCC can cast a knowing eye on suspect representations that to a court might seem reliable. Congress entrusts the agency with responsibility to make these kinds of decisions. The rule works no unfairness because all the desired information was within LeSea's control—the language expressing its commitment, the equipment order, the decision not to put down a deposit, and the failure to identify available studio space. LeSea claims it ought to have been given the opportunity to correct these omissions, especially as its representations were uncontested.

■ Appellants also claim, and rightfully so, that their representations cannot be discredited by association with NOC's abysmal record. *See New Television Corp.*, 65 F.C.C.2d 680, 681 (1977) ("In order to receive an extension of time in which to construct a broadcast station, an applicant must demonstrate that *either* of the following circumstances pertains: (a) that the failure to construct was due to unforeseen circumstances beyond the applicants' control; or (b) that other matters justify the extension." (emphasis added)). The objection, however, is unavailing as a legal matter. The regulations clearly and unambiguously put the burden on appellants to make their showing with *specific and detailed* evidence. The FCC gave the application a "hard look" and issued a reasoned opinion setting forth the deficiencies. *WAIT Radio v. FCC [I]*, 418 F.2d 1153, 1156–57 (D.C. Cir.1969). This ends the matter. *See WAIT Radio [II]*, 459 F.2d 1203, 1204 (D.C.Cir.1972) (agency satisfied "minimum standards of decisionmaking" and did not exceed its discretion in denying waiver application). The FCC is not obligated as a matter of law to save parties from defective filings. Indeed, in this case, appellants did not even petition the FCC for reconsideration of its decision and include the requisite documentation.

■ Appellants next argue that they have been denied the same treatment accorded three similarly situated parties who have successfully sought an extension. We reject this argument. The FCC distinguishes these cases on their facts; and at least as to Tulsa and Crossville, we agree that the differences are not trivial. More important, the theory of comparable treatment advanced by appellants would strip the FCC of any flexibility to bring its informed discretion to bear in resolving close cases and accommodating special circumstances. When every exception becomes a rule, administrative rigor mortis sets in.

According to the FCC, in Tulsa, the distinguishing fact was that "alternative transmitter sites were promptly procured, equipment was ordered and construction was proceeding." 104 F.C.C.2d at 315. Specifically, the proposed assignee had made a $200,000 payment on its $728,000 equipment order. The record does not suggest that the payment was refundable. These distinctions support the FCC's conclusion that in Tulsa, unlike here, the public interest would be best served by granting the extension and approving the transfer to a new permittee.

In Crossville, the application dealt with a licensed station not currently broadcasting, but where the *"bona fide* concern to restore ... service had been shown....*" Id.* at 316. In addition, documentary evidence supported the conclusion that the assignee "would proceed diligently with presumption of broadcast operations and complete construction of the station's proposed permanent facility." Brief for Appellee at 16 (citation omitted). The FCC also noted that as the Crossville station was licensed, "the failure to construct ... modified facilities would not free the channel for application by other parties." 104 F.C.C.2d at 316. The record again supports the FCC's analysis. The equipment needed to operate the temporary facility was ninety percent in hand, specific commitments had been made to get the auxiliary transmission on line in thirty days, and firm commitments were made for completing the new permanent tower. Added to this is the significant

fact, emphasized at several points in the Crossville opinion, that it was the only station serving the local community and thus speed was of the essence. *WINT–TV, Inc.,* Mem.Op. No. 2402 (released Feb. 6, 1986).

In Kalamazoo, the assignee pledged "to construct the station by a fixed date, provided a construction schedule, ordered equipment and placed a substantial down payment on that equipment." 104 F.C.C.2d at 316. Nonetheless, the Kalamazoo extension presents a closer case. As here, the permit holder had made no progress in completing construction, the total delay in construction was comparable, and the representations made by the assignee were relatively scant. The principal difference is that the Kalamazoo party, also a religious broadcaster, made an "unqualified commitment" and submitted a tentative order invoice with a $25,000 refundable deposit placed in escrow. In addition, in the FCC's eyes, a half-page timetable submitted by the assignee constituted a construction schedule. To be sure, these are differences. It is rather more questionable to say that these facts "differ[ ] substantially from the facts here," *id.* at 315, but given the deference owed the Commission in evaluating extension and waiver requests, such a judgment survives our scrutiny. *See WAIT Radio [I],* 418 F.2d at 1157 ("A general rule implies that a commission need not re-study the entire problem de novo and reconsider policy every time it receives an application for waiver of the rule.").

In arguing that the grant of extension by the FCC in three factually distinguishable cases establishes a baseline for mandatory agency treatment, appellants rely principally on *Melody Music, Inc. v. FCC,* 345 F.2d 730 (D.C.Cir.1965), a case involving two licensees charged with equally culpable involvement in the programs giving rise to the game-show scandals of the late 1950's. One was NBC, the other was the show producer and license holder Melody Music. The FCC sought to deny the license renewal to Melody Music, but brushed over the incident in the case of NBC. This court reversed because the agency failed to articulate any reasons for the disparate treatment. It further stated, in dicta, the sensible proposition that parties implicated by the same underlying transaction be treated equally. *Melody Music,* 345 F.2d at 732.

Appellants also cite approvingly to *Garrett v. FCC,* 513 F.2d 1056 (D.C.Cir.1975), where this court remanded to the FCC for failure to consider a station's minority ownership in denying a waiver that would have allowed the station to broadcast at nighttime. Prior Commission precedent, said the court, expressly recognized minority ownership as a relevant factor in licensing, and other parties similarly situated had been granted a waiver in parallel circumstances. The court remanded on the theory that "agency action cannot stand when it is 'so inconsistent with its precedent as to constitute arbitrary treatment amounting to an abuse of discretion.'" *Id.* at 1060 (quoting *Melody Music,* 345 F.2d at 732–33).

We affirm the standard, but find that it does not extend to the present case and transform isolated grants of construction permit extensions into a rule binding on the agency. *Melody Music* and its progeny appropriately recognize the importance of treating parties alike when they participate in the same event or when the agency vacillates without reason in its application of a statute or the implementing regulations. But this proposition is distinguishable from the present case, involving as it does a routine request for an extension and an agency denial issued in full conformity with the FCC's procedural and substantive obligations. No precedent can be cited that has been inexplicably ignored, as in *Garrett.* The basic transaction is not identical, as in *Melody Music.* No other special circumstances compel us to augment the *WAIT Radio* analysis with considerations of unequal treatment.

It bears emphasizing that any party denied a waiver feels aggrieved, but so long as the agency does not display evident disregard for its precedents, no violation occurs. Appellants' theory would paralyze agency discretion to deal with waiver and extension requests on a case-by-case basis.

Parties at some point have a right to cry foul, but to reach that point here would reduce the doctrine of similar treatment to an absurdity, and a dangerous one at that for it would imply that exceptions granted by an agency become de facto law. This in turn undermines the rationale for waivers, described by this court as "a limited safety valve [that] permits a more rigorous adherence to an effective regulation." *WAIT Radio [I]*, 418 F.2d at 1159.

■ *WAIT Radio [I]* accurately states the pertinent obligations placed upon the agency. Waiver requests constitute "an important member of the family of administrative procedures." *Id.* The general obligation of reasoned decisionmaking applies where the party has presented an application "stated with clarity and accompanied by supporting data." *Id.* at 1157. As a consequence, "[t]he agency may not act out of unbridled discretion or whim in granting waivers....," *id.* at 1159, though it "need not sift pleadings and documents to identify such applications." *Id.* at 1157. Furthermore, "[e]ven when an application complies with these rigorous requirements, the agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the why and wherefore." *Id.* at 1157 n. 9 (internal citations omitted). Here the FCC subjected appellants' application to a hard look and, on the merits, found that LeSea failed to submit sufficiently specific information. The inadequacies in LeSea's submission preclude a finding by the court that the FCC abused its discretion.

### III. Conclusion

LeSea failed to submit "specific and detailed" evidence of its commitment to construct Channel 20 in New Orleans, and certainly failed to demonstrate that the FCC's evaluation of the request for an extension of time was an abuse of agency discretion. The FCC adequately explained its reasoning. The agency did not act contrary to its precedent. Accordingly, the FCC's order is

*Affirmed.*