**GENERAL ELECTRIC COMPANY,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,**
Respondent.

No. 93–1807.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 3, 1995.

Decided May 12, 1995.

As Corrected June 19, 1995.

Andrew J. Pincus, Washington, DC, argued the cause, for petitioner. With him on the briefs, were John J. Sullivan, John P. Schmitz, Washington, DC, and Francis S. Blake, Schenectady, NY.

Robert I. Dodge, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for respondent. With him on the brief were Lois J. Schiffer, Asst. Atty. Gen., U.S. Dept. of Justice and James H. Curtin, Atty., U.S. E.P.A., Washington, DC. Mary E. Gleaves and Russell M. Young, Washington, DC, entered appearances.

Before: WALD, SILBERMAN, and TATEL, Circuit Judges.

TATEL, Circuit Judge:

The Environmental Protection Agency fined the General Electric Company $25,000 after concluding that it had processed polychlorinated biphenyls in a manner not authorized under EPA's interpretation of its regulations. We conclude that EPA's interpretation of those regulations is permissible, but because the regulations did not provide GE with fair warning of the agency's interpretation, we vacate the finding of liability and set aside the fine.

## I.

GE's Apparatus Service Shop in Chamblee, Georgia decommissioned large electric transformers. Inside these transformers was a "dielectric fluid" that contained high concentrations of polychlorinated biphenyls ("PCBs"), which are good conductors of electricity. PCBs are also dangerous pollutants. "[A]mong the most stable chemicals known," they are extremely persistent in the environment and have both acute and chronic effects on human health. 3 William H. Rodgers, Environmental Law § 6.9, at 461 (1988) (internal quotation marks and citations omitted). Recognizing the dangers of PCBs, Congress has required their regulation under the Toxic Substances Control Act. 15 U.S.C. §§ 2601–29 (1988 & Supp. V 1993) ("TSCA"); *id.* at § 2605(e). Pursuant to TSCA, the EPA promulgated detailed regulations governing the manufacture, use, and disposal of PCBs. *See* 40 C.F.R. pt. 761 (1994).

Because GE's transformers were contaminated with PCBs, the company had to comply with the disposal requirements of 40 C.F.R. § 761.60. Section 761.60(b)(1) requires the disposal of transformers by either incinerating the transformer, 40 C.F.R. § 761.60(b)(1)(i)(A), or by placing it into a chemical waste landfill after the PCB-laced dielectric fluid has been drained and the transformer rinsed with a PCB solvent, *id.* at (B). GE chose the "drain-and-landfill" option of section 761.60(b)(1)(i)(B).

The drain-and-landfill alternative required GE to dispose of the liquid drained from the transformer "in accordance with" the terms of section 761.60(a). *Id.* Since the dielectric fluid contained extremely high concentrations of PCBs, the relevant provision of section 761.60(a) was section (1), a catch-all section applicable to liquids contaminated with more than 500 parts per million ("ppm") of PCBs. This section required those disposing of these particularly dangerous materials to do so solely by incineration in an approved facility. 40 C.F.R. § 761.60(a). In accord with that requirement, GE incinerated the dielectric fluid after draining it from the transformers. It then soaked the transformers in a PCB solvent—in this case, freon—for 18

hours, drained the contaminated solvent, and immediately incinerated it as well.

In March, 1987, GE changed these procedures, beginning a process that ultimately led to the EPA complaint in this case. While GE continued to incinerate the dielectric fluid, it began a recycling process that recovered a portion of the dirty solvent through distillation. After soaking the transformer, GE poured the dirty solvent into a still that heated the freon, boiling off about 90% of it. The 10% of the liquid that was left, which was highly contaminated with presumably all the PCBs that had been rinsed from the transformer, was immediately incinerated. Meanwhile, the vapor from the still was cooled, recondensing into nearly pure liquid freon that contained less than the regulatory threshold of 50 ppm PCBs and, as an administrative law judge later found, probably less than the detectable level of 2 ppm. *See General Electric Co.,* EPA Docket No. TSCA–IV–89–0016, 1992 TSCA LEXIS 2, at *69 (Feb. 7, 1992) [hereinafter *ALJ Decision*]. GE then used this recycled solvent to rinse other transformers.

GE and EPA agree that the regulations require the incineration of the solvent. They disagree about whether the intervening distillation and recycling process violated the regulations. EPA argues that section 761.60(b)(1)(i)(B) required GE to dispose of all the dirty solvent "in accordance with the requirements of [section 761.60(a)(1) ]"—i.e., by immediate incineration. § 761.60(b)(1)(i)(B). GE did not think that section prohibited it from taking intermediate steps like distillation prior to incinerating the PCBs. To GE, distillation was permitted by section 761.20(c)(2), which allows the processing and distribution of PCBs "for purposes of disposal in accordance with the requirements of § 761.60." 40 C.F.R. § 761.20(c)(2). GE believed that this section authorized intermediate processing "for purposes of disposal"—processing such as distillation—as long as it complied with the other requirements of the PCB regulations like those relating to the management of spills, storage, and labelling of PCB materials. EPA has not alleged that GE's distillation process failed to comply with those require-

ments. In fact, as the ALJ later concluded, distillation reduced the amount of contaminated materials, thus producing environmental benefits. `See ALJ Decision, 1992 TSCA LEXIS 2, at *73.

Despite those benefits, EPA charged the company with violating the PCB disposal regulations. After a hearing, an ALJ agreed and assessed a $25,000 fine. On appeal, the Environmental Appeals Board modified the ALJ's reasoning, but agreed with the disposition of the complaint and upheld the $25,000 penalty. See General Electric Co., TSCA Appeal No. 92–2a, 1993 TSCA LEXIS 265 (Envtl.App.Bd., Nov. 1, 1993) [hereinafter Appeal Decision ]. In other proceedings, the agency found the company liable for distillation it performed in six other locations, but suspended the fines for those violations pending the outcome of this appeal.

II.

■ GE argues that EPA's complaint is based on an arbitrary, capricious, and otherwise impermissible interpretation of its regulations. See 5 U.S.C. § 706(2)(A) (1988). To prevail on this claim, GE faces an uphill battle. We accord an agency's interpretation of its own regulations a "high level of deference," accepting it "unless it is plainly wrong." General Carbon Co. v. OSHRC, 860 F.2d 479, 483 (D.C.Cir.1988) (internal punctuation and citations omitted); see also Hazardous Waste Treatment Council v. Reilly, 938 F.2d 1390, 1395 (D.C.Cir.1991) (court will not reverse unless interpretation is "plainly erroneous or inconsistent with the regulation" (internal punctuation and citation omitted)). Under this standard, we must defer to an agency interpretation so long as it is "logically consistent with the language of the regulation[s] and ... serves a permissible regulatory function." Rollins Envtl. Servs., Inc. v. EPA, 937 F.2d 649, 652 (D.C.Cir. 1991). The policy favoring deference is particularly important where, as here, a technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations. In such circumstances, "the arguments for deference to administrative expertise are at their strongest." Psychiatric Inst. of Washington, D.C. v.

Schweiker, 669 F.2d 812, 813–14 (D.C.Cir. 1981); see also Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 865, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984).

■ In adhering to this policy, we occasionally defer to "permissible" regulatory interpretations that diverge significantly from what a first-time reader of the regulations might conclude was the "best" interpretation of their language. Cf. American Fed. Gov't Employees v. FLRA, 778 F.2d 850, 856 (D.C.Cir.1985) ("As a court of review ... we are not positioned to choose from plausible readings the interpretation we think best." (internal punctuation and citation omitted)). We may defer where the agency's reading of the statute would not be obvious to "the most astute reader." Rollins, 937 F.2d at 652. And even where the petitioner advances a more plausible reading of the regulations than that offered by the agency, it is "the agency's choice [that] receives substantial deference." Id.

■ Through this policy of deference, agencies, not courts, retain control over which permissible reading of the regulations they will enforce. Appropriately so, since it is the agencies, not the courts, that have the technical expertise and political authority to carry out statutory mandates. See Chevron, 467 U.S. at 864–66, 104 S.Ct. at 2792–93.

■ In this case, EPA's Appeals Board concluded that section 761.60(b)(1)(i)(B) of the regulations required GE to dispose of the dirty solvent "in accordance with" a disposal method approved under section 761.60(a). Because distillation was not such a method, it concluded that GE had violated the regulations. GE argues that EPA's reading of the regulations is impermissible because all the solvent was eventually incinerated, because distillation is not a means of disposal but merely pre-disposal processing, and because the regulations explicitly allow pre-disposal processing to occur prior to the ultimate incineration. While GE's claims have merit, they do not demonstrate that the agency's interpretation of this highly complex regulatory scheme is impermissible.

Section 761.60(b)(1)(i)(B) required the incineration of the dirty solvent. GE argues that it complied with this requirement since all the solvent was or ultimately would have been incinerated: it immediately incinerated the concentrated PCB liquid left in the still, while the "clean," distilled solvent would also be incinerated—that is, eventually incinerated—since 40 C.F.R. § 761.1(b), known as the "anti-dilution" provision, required GE to treat the clean solvent as if it contained the same concentration of PCBs as the more highly contaminated PCB liquids with which it had been in contact. *See Rollins*, 937 F.2d at 652. To the EPA, however, the regulations required immediate incineration of the entire mixture drained from the transformer. While GE is correct that section 761.60(b)(1)(i)(B) does not explicitly impose such a requirement, the agency's reading is plausible.

GE complains that distillation could not have violated the disposal requirements because it is not a means of "disposal." But the regulations broadly define "disposal" to include "actions related to containing, transporting, destroying, degrading, decontaminating, or confining PCBs and PCB Items." 40 C.F.R. § 761.3. It was therefore permissible for EPA to conclude that distillation was a type of disposal and, since section 761.60(a) does not authorize distillation as a means of disposal, to conclude that the process violated section 761.60(b)(1)(i)(B). After all, through distillation nearly 90% of the PCB liquid avoided, until some time in the future, the imminent incineration that EPA interpreted section 761.60(b)(1)(i)(B) to require.

Finally, GE asserts that the agency's reading would illogically bar all handling of PCB liquids after they were drained from transformers, including the storage and transportation of PCB liquids to their incineration site. EPA responds, not unreasonably, that such "incidental" treatment of the dirty solvent is implicitly authorized by the disposal regulations. In contrast, the agency argues, no such implicit permission exists for distillation, a process which alters the physical state of PCB liquids and is thus of a different kind and quality than mere storage or transporta-

tion. According to GE, no implicit permission is necessary since distillation merely involves processing PCBs, "for purposes of disposal," and section 761.20(c)(2) explicitly allows parties to process PCBs "for purposes of disposal." But the agency points out—again, not unreasonably—that section 761.20(c)(2) is contained in and is an exemption to the "use" regulations. Thus, the agency claims, although section 761.20(c)(2) authorizes "use" of PCBs, it does not authorize parties to *dispose* of PCB liquids in any way other than through those processes authorized by the disposal regulations.

Particularly in the context of this comprehensive and technically complex regulatory scheme, EPA's interpretation of the regulations is permissible. Although GE's interpretation may also be reasonable, at stake here is the proper disposal of a highly toxic substance. We defer to the reasonable judgment of the agency to which Congress has entrusted the development of rules and regulations to ensure its safe disposal.

Had EPA merely required GE to comply with its interpretation, this case would be over. But EPA also found a violation and imposed a fine. Even if EPA's regulatory interpretation is permissible, the company argues, the violation and fine cannot be sustained consistent with fundamental principles of due process because GE was never on notice of the agency interpretation it was fined for violating. It is to this issue that we now turn.

### III.

Due process requires that parties receive fair notice before being deprived of property. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The due process clause thus "prevents ... deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C.Cir.1986). In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or crimi-

nal liability. Of course, it is in the context of criminal liability that this "no punishment without notice" rule is most commonly applied. *See, e.g., United States v. National Dairy Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963) ("[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."). But as long ago as 1968, we recognized this "fair notice" requirement in the civil administrative context. In *Radio Athens, Inc. v. FCC,* we held that when sanctions are drastic—in that case, the FCC dismissed the petitioner's application for a radio station license—"elementary fairness compels clarity" in the statements and regulations setting forth the actions with which the agency expects the public to comply. 401 F.2d 398, 404 (D.C.Cir.1968); *see also Maxcell Telecom Plus, Inc. v. FCC,* 815 F.2d 1551, 1558 (D.C.Cir.1987) (describing FCC's legal duty to provide adequate notice of requirements). This requirement has now been thoroughly "incorporated into administrative law." *Satellite Broadcasting Co. v. FCC,* 824 F.2d 1, 3 (D.C.Cir.1987); *see also Rollins,* 937 F.2d at 654 n. 1, 655 (Edwards, J., dissenting in part and concurring in part) (principle is not constitutional, but "basic hornbook law in the administrative context," and "simple principle of administrative law").

 Although the agency must always provide "fair notice" of its regulatory interpretations to the regulated public, in many cases the agency's pre-enforcement efforts to bring about compliance will provide adequate notice. If, for example, an agency informs a regulated party that it must seek a permit for a particular process, but the party begins processing without seeking a permit, the agency's pre-violation contact with the regulated party has provided notice, and we will enforce a finding of liability as long as the agency's interpretation was permissible. In some cases, however, the agency will provide no pre-enforcement warning, effectively deciding "to use a citation [or other punishment] as the initial means for announcing a particular interpretation"—or for making its interpretation clear. *E.g. Martin v. OSHRC,* 499 U.S. 144, 158, 111 S.Ct. 1171, 1180, 113 L.Ed.2d 117 (1991) (noting that such a deci-

sion may raise a question about "the adequacy of notice to regulated parties"). This, GE claims, is what happened here. In such cases, we must ask whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations. If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation. *See Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5th Cir.1976).

Three recent cases in this circuit illustrate the application of the fair notice rule to agency regulatory interpretations. *Gates & Fox Co. v. OSHRC* involved OSHA regulations that required employers who were constructing tunnels to provide emergency breathing equipment for employees working on the "advancing face" of the tunnel, and also required "[s]uch equipment ... [to] be on the haulage equipment and in other areas where employees might be trapped by smoke or gas." 790 F.2d at 155 (citation omitted). An OSHA investigator cited Gates & Fox for not providing breathing equipment in an area in which, while nowhere near an "advancing face," employees might nonetheless have been "trapped by smoke or gas." *Id.* The agency's Review Commission was unable to agree on whether the regulation could be read to require breathing equipment in such areas. It compromised by finding a violation, although not a willful one. Writing for the court, then–Judge Scalia concluded that OSHA had not provided Gates & Fox with "constitutionally adequate notice." *Id.* at 156. Pointing out that the language of the regulation regarding "areas where employees might be trapped" could "reasonably be read to refer only to ... areas near an advancing face," we held that the regulation failed to "give fair notice" that breathing equipment was necessary in *all* areas where employees might be trapped. *Id.* However, we "expressed no opinion on whether, in a nonpenal context, the [agency's] interpretation of [the regulation] might be permissible." *Id.*

We therefore left open the possibility that we would have deferred to the agency's interpretation had it merely required Gates & Fox to provide such apparatus and not punished it until after it had given notice of that requirement.

In *Satellite Broadcasting Co. v. FCC*, the FCC dismissed Satellite's application for a microwave radio station because it was filed in Washington, D.C., not in Gettysburg, Pa., as the FCC determined the regulations to require. But the specific regulation governing the filing of the application was silent on the appropriate location to file, and other regulations offered "baffling and inconsistent" advice. 824 F.2d at 2. Assuming "arguendo" that the interpretation was permissible, we ruled that the Commission should not have dismissed Satellite's application: "[T]he Commission through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting Commission rules. ... The agency's interpretation is entitled to deference, but if it wishes to use that interpretation to cut off a party's right, it must give full notice of its interpretation." *Id.* at 4.

In *Rollins Environmental Services, Inc. v. EPA*, as in this case, the EPA accused the petitioner of failing properly to incinerate a solvent that it had used to rinse out containers—in that case, concrete basins—that had once contained PCBs. 937 F.2d at 651. The relevant rule for rinsing basins stated that "[t]he solvent may be reused for decontamination until it contains 50 ppm PCB. The solvent shall then be disposed of as a PCB in accordance with § 761.60(a)." *Id.* (citation omitted). Rollins reused the solvent several times, but it never reached a concentration of 50 ppm PCBs, and so Rollins disposed of the solvent in a way that was not TSCA-approved. An ALJ found a violation of the regulation, but a second ALJ assessed no financial penalty because he thought the regulations "unclear" and that Rollins' interpretation "had a definite plausibility." *Id.* On appeal within the agency, the reviewing officer concluded that the regulation was clear and imposed a $25,000 fine. *Id.* at 652.

Although we held that EPA's interpretation of the regulations was permissible, we agreed with the second ALJ that the language of the regulation was ambiguous and that both interpretations were reasonable. We also pointed out that "significant disagreement" existed among EPA's various offices regarding the proper interpretation of the language. *Id.* at 653. But Rollins had failed to raise the due process issue in his briefs or before the agency, so we allowed the violation to stand. Nonetheless, we concluded that the ambiguity of the regulation justified rescinding the fine against Rollins under TSCA's mitigation provision, which required the agency to take into account the "extent, and gravity of the violation ... the degree of culpability, and such other matters as justice may require" in setting the amount of the penalty. *Id.* at 654 (citing 15 U.S.C. § 2615(a)(2)(B)). Dissenting in part, now–Chief Judge Edwards concluded that Rollins had adequately raised the "fair notice" issue and that the regulation clearly did not provide fair notice. He would have vacated the violation altogether, thereby precluding the EPA from using the violation as a basis for increasing fines against the company in later liability proceedings. *Id.* at 654–57 & n. 2.

■ Unlike in *Rollins*, GE has clearly raised the due process "notice" issue in this case. Although we defer to EPA's interpretation regarding distillation because it is "logically consistent with the language of the regulation[s]," *Rollins*, 937 F.2d at 652, we must, because the agency imposed a fine, nonetheless determine whether that interpretation is "ascertainably certain" from the regulations, *see Diamond Roofing*, 528 F.2d at 649. As in *Gates & Fox* and *Satellite Broadcasting*, we conclude that the interpretation is so far from a reasonable person's understanding of the regulations that they could not have fairly informed GE of the agency's perspective. We therefore reverse the agency's finding of liability and the related fine.

On their face, the regulations reveal no rule or combination of rules providing fair notice that they prohibit pre-disposal processes such as distillation. To begin with, such notice would be provided only if it was "reasonably comprehensible to people of good faith" that distillation is indeed a means

of "disposal." *McElroy Electronics Corp. v. FCC,* 990 F.2d 1351, 1358 (D.C.Cir.1993) (internal punctuation, citations, and emphasis omitted). While EPA can permissibly conclude, given the sweeping regulatory definition of "disposal," that distillation is a means of disposal, such a characterization nonetheless strays far from the common understanding of the word's meaning. *Cf. American Mining Congress v. EPA,* 824 F.2d 1177, 1184 (D.C.Cir.1987) (noting that the plain meaning of the term "discarded" was "disposed of," "thrown away," or "abandoned"). A person "of good faith," *McElroy,* 990 F.2d at 1358, would not reasonably expect distillation—a process which did not and was not intended to prevent the ultimate destruction of PCBs—to be barred as an unapproved means of "disposal."

Not only do the regulations fail clearly to bar distillation, they apparently permit it. Section 761.20(c)(2) permits processing and distribution of PCBs "for purposes of disposal." This language would seem to allow parties to conduct certain pre-disposal processes without authorization as long as they facilitate the ultimate disposal of PCBs and are done "in compliance with the requirements of this Part"—i.e., in accordance with other relevant regulations governing the handling, labelling, and transportation of PCBs. § 761.20(c)(2). EPA argues—permissibly, as we concluded above—that the section allows parties to "use" PCBs in the described manner, but that those uses must still comply with the disposal requirements of section 761.60, including the requirement that unauthorized methods of disposal receive a disposal permit from the agency. This permissible interpretation, however, is by no means the most obvious interpretation of the regulation, particularly since, under EPA's view, section 761.20(c)(2) would not need to exist at all. If every process "for purposes of disposal" also requires a disposal permit, section 761.20(c)(2) does nothing but lull regulated parties into a false sense of security by hinting that their processing "for purposes of disposal" is authorized. While the mere presence of such a regulatory trap does not reflect an irrational agency interpretation, *see Radio Athens,* 401 F.2d at 404 ("[T]he process of interpretation is never completely devoid of surprise."), it obscures the agency's interpretation of the regulations sufficiently to convince us that GE did not have fair notice that distillation was prohibited.

GE points out that if section 761.20(c)(2) is applied as EPA interprets it, the regulations apparently would not authorize, on their face, *any* steps between the draining of the fluid and its incineration even though such steps are clearly necessary. Drained fluids, for example, must be stored and transported to the incinerator. According to GE, section 761.20(c)(2) provides explicit permission for these pre-disposal processes, while under EPA's view, such incidental processes would require permits. But the agency has never imposed such a broad permit requirement on this type of intermediate PCB "processing." To avoid this inconsistency, the agency argues that while storage, transportation, and other "processing steps that are truly incidental and necessary to the disposal methods prescribed by the regulations" do require authorization other than that in section 761.20(c)(2), authorization for such steps is nonetheless "implicit" in section 761.60's disposal regulations. Government Brief at 27. Although this reading is certainly permissible, the agency presents it for the first time in this appeal, and it represents a further stretching of the regulations, reinforcing our conclusion that GE did not have fair notice of the agency's interpretation. Indeed, the agency itself has recognized that its interpretation of section 761.20(c)(2) is not apparent. It has recently proposed new regulations that would make this implicit waiver for incidental pre-disposal processing explicit by "clarifying" section 761.20(c)(2). *See* Disposal of Polychlorinated Biphenyls, 59 Fed.Reg. 62788, 62802 (1994) (to be codified at 40 C.F.R. pt. 761) (proposed Dec. 6, 1994).

The location in which EPA has proposed to codify these new regulations adds to our concern about the clarity of the present ones. The new regulations apply to section 761.20(c)(2), and are intended, according to the agency, to "clarify[ ] how [§ 761.20(c)(2) ] applies to the *disposal* of all PCBs." 59 Fed.Reg. at 62802 (emphasis added). To us, this seems to contradict EPA's assertion here that section 761.20(c)(2) does not apply

to *disposal* of PCBs, but only to their use. If, as the agency asserts, section 761.20(c)(2) merely authorizes the "use" of pre-disposal activities, and that it is section 761.60 which "implicitly" permits incidental processing, then the agency should have added the recent language making that permission explicit to section 761.60, not to section 761.20(c)(2). By "clarifying" that section 761.20(c)(2) fully authorizes incidental pre-disposal activities, EPA lends support to GE's argument that, prior to the amendments, section 761.20(c)(2) fully authorized all pre-disposal processing "for purposes of disposal," and that the company could not therefore have been on notice of the agency's contrary interpretation.

Our concern about the regulations' lack of clarity is heightened by several additional factors. First, GE and EPA have had considerable difficulty even identifying which portion of section 761.60(a) applied to the disposal of the dirty solvent. Section 761.60(a) sets forth several different sets of disposal options depending on the type of contaminated material and its level of contamination. As the ALJ found, tests of the distillation process in this case showed that the dirty solvent contained PCBs well in excess of 50,000 ppm. The only portion of section 761.60(a) that applies to such highly concentrated PCB materials in section 761.60(a)(1), which directs, without exception, the incineration of the material. As the ALJ recognized, section 761.60(a)(3), which would apply to solvent with concentrations between 50 and 500 ppm, is not applicable in this case. *See ALJ Decision,* 1992 TSCA LEXIS 2, at *57. Yet, EPA's original complaint, the decision of the Appeals Board, and EPA's brief before this court all rely on section 761.60(a)(3) rather than (a)(1). *See* Complaint, EPA Docket No. TSCA–IV–89–0016 (May 12, 1989), *in* Joint Appendix (J.A.) at 14 (listing processes authorized by section 761.60(a)(3) as the only authorized means of disposal); *Appeal Decision,* 1993 TSCA LEXIS 265, at *25–26 & n. 16 (citing section 761.60(a)(3) as relevant); Government Brief at vi (labelling section 761.60(a)(3) as a section upon which its brief "principally relies"). GE did not discover this error until its reply

brief. Such confusion does not inspire confidence in the clarity of the regulatory scheme.

Second, as both *Gates & Fox* and *Rollins* recognized, it is unlikely that regulations provide adequate notice when different divisions of the enforcing agency disagree about their meaning. Such is the case here. In 1984, one EPA regional office concluded that companies could distill PCB materials without seeking additional authorization from the EPA. *See* Letter from EPA Region IV to American Industrial Waste, Inc. (July 5, 1984), *in* J.A. at 99. Although GE never proved it, the company asserted in its initial replies to the agency that a second regional office had told it the same thing. *See* Letter from GE Counsel to EPA (July 9, 1987), *in* J.A. at 67. While we accept EPA's argument that the regional office interpretation was wrong, confusion at the regional level is yet more evidence that the agency's interpretation of its own regulation could not possibly have provided fair notice.

Finally, EPA's position regarding the basis for GE's liability has subtly shifted throughout this case. The agency initially premised GE's liability on the company's failure to seek a permit for the distillation process. The original discussions between GE and EPA, as well as the ALJ's decision, presumed that distillation could be conducted only with a permit issued under section 761.60(e), which provides for "alternative methods" of destroying PCBs. 40 C.F.R. § 761.60(e). It is not at all obvious, however, that section 761.60(e) provides authority to issue a permit for this distillation process: the alternate methods of disposal approved through section 761.60(e)'s process are explicitly authorized as alternatives only for fluids governed by sections 761.60(a)(2) and (3), neither of which applies here because they address the disposal of fluids with PCB concentrations much lower than the dirty solvent in this case. And, as the Environmental Appeals Board recognized, section 761.60(e) only allows permits for alternative methods of PCB "*destruction,*" and distillation is not destruction, but separation. *Id.* (emphasis added); *see Appeal Decision,* 1993 TSCA LEXIS 265, at *38–39. Recognizing the uncertain regulatory source for the per-

mit requirement, the Appeals Board was forced to reject the ALJ's analysis and to conclude that the permit provisions were irrelevant. *Id.* at *39–41. Thus, even the agency's own interpretive bodies were unable to discern clearly whether the initial basis for GE's liability—failing to get a permit for distillation—was required or even provided for in the regulations. EPA can hardly hold GE liable for adopting a reasonable alternative reading of the regulations that alleviated this confusion altogether.

Notwithstanding the lack of clarity in the regulations themselves, the agency argues that GE was nevertheless on notice of its interpretation. It begins by pointing to a policy statement on PCB "separation activities" issued in 1983, claiming that it provided a sufficiently clear statement of its belief that distillation required agency approval. We disagree. Although some language in that policy statement does appear to address activities like distillation, requiring further approval for "activities that can be construed to be part of, or an initiation of a disposal activity," the statement's primary focus is on preventing parties from using such processes to circumvent the disposal requirements. EPA, TSCA Compliance Program Policy No. 6–PCB–2 at 1 (August 16, 1983), *in* J.A. at 23. As the statement notes, "it is possible to physically separate PCBs from liquids ... without EPA approval as long as these liquids ... are treated (used, stored, disposed of, etc.) as if they still contain their original PCB concentration." *Id.* at 3, *in* J.A. at 25. A reasonable interpretation of this language is that a physical separation process that is neither intended to avoid nor actually avoids the disposal requirements for PCBs is permissible "without EPA approval" as long as it is handled in a manner consistent with the PCB regulations. GE's distillation was such a process, since the solvent was at all times handled as if it contained high concentrations of PCBs. EPA's contrary understanding of the policy statement's language is not so obvious that we consider GE to have had fair notice of the agency's reading.

Nor are we persuaded by EPA's argument that GE had actual notice of the regulatory requirements before and during 1987's distillation processing. EPA relies on the fact that in 1986, GE sought and received a permit for an alternative transformer disposal process which included distillation. That permit, however, was for a process that was an alternative to the suggested methods of disposing of *entire* transformers under section 761.60(b)(1). While GE sought a permit for that alternative, its decision to do so does not mean that it knew EPA required a permit for distillation in itself. Nor did an April, 1987, letter from EPA regarding distillation at GE's Cleveland facility provide GE with notice that it was violating the regulation. *See* Letter from EPA to GE (April 15, 1987), *in* J.A. at 65–66. That letter merely said that distillation may require a permit. As we have already pointed out, whether permits are required for distillation—let alone authorized under the regulations—is somewhat uncertain, and the EPA has argued here that the permit requirements are irrelevant. Furthermore, the letter does not require GE to get a permit; as the ALJ found, EPA "did not finally inform GE a permit was required until October 1, 1987," after GE had stopped using the process. *ALJ Decision,* 1992 TSCA LEXIS 2, at *70. Equally important, the April letter only asked GE to provide additional information about its distillation process. It did not categorically bar all types of distillation, did not direct GE to halt distillation processing, and, by requesting additional information, apparently left open the possibility that some types of distillation are authorized by the regulations. GE's response to the letter—that it believed that the regulations and policy statement only prohibited using distillation to circumvent the means of disposal required by section 761.60—reinforces the company's argument that it did not understand EPA to mean that distillation was impermissible per se. *See* Letter from GE General Counsel to EPA (July 9, 1987), *in* J.A. at 66–67. Because all the fluids involved were ultimately incinerated, GE reasonably believed that it had complied with the regulations, and the letter did not clearly put the company on notice that the agency believed otherwise.

We thus conclude that EPA did not provide GE with fair warning of its interpretation of the regulations. Where, as here, the

regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not "on notice" of the agency's ultimate interpretation of the regulations, and may not be punished. EPA thus may not hold GE responsible in any way—either financially or in future enforcement proceedings—for the actions charged in this case. Although we conclude that EPA's interpretation of the regulations is permissible, we grant the petition for review, vacate the agency's finding of liability, and remand for further proceedings consistent with this opinion.

*So ordered.*