United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 17, 1999 Decided December 21, 1999 

 No. 98-1478

 Lakeshore Broadcasting, Inc., 
 Appellant

 v.

 Federal Communications Commission, 
 Appellee

 Appeal of an Order of the 
 Federal Communications Commission

 George R. Borsari, Jr. argued the cause for appellant. 
With him on the briefs was Anne Thomas Paxson.

 Pamela L. Smith, Counsel, Federal Communications Com-
mission, argued the cause for appellee. On the brief were 
Christopher J. Wright, General Counsel, Daniel M. Arm-
strong, Associate General Counsel, C. Grey Pash, Jr., and K. 
Michele Walters, Counsel.

 Before: Ginsburg, Henderson, and Randolph, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: Lakeshore Broadcasting Corpo-
ration appeals an order of the Federal Communications Com-
mission dismissing Lakeshore's application for a construction 
permit due to its failure to make timely payment of the 
hearing fee. Pursuant to Commission regulations, the dead-
line for payment of the hearing fee had been announced in a 
public notice released only in the Commission's press office in 
Washington, D.C. 

 Lakeshore claims that the Commission violated the Com-
munications Act of 1934, the agency's own regulations, and 
the Due Process Clause of the Fifth Amendment to the 
Constitution of the United States by dismissing Lakeshore's 
application for failure to meet a deadline of which Lakeshore 
was never given personal notice. Lakeshore also challenges 
as arbitrary and capricious the Commission's denial of Lake-
shore's petition for waiver of the deadline and reinstatement 
of its application.

 We affirm the order of the Commission. The dismissal of 
Lakeshore's application for failure to pay by the deadline 
does not violate any statutory, regulatory, or constitutional 
constraint. Because the Commission's policy is lawful, and 
because Lakeshore has failed to demonstrate that the agency 
treated its application differently from others similarly situat-
ed, the Commission properly denied Lakeshore's petition for 
waiver and reinstatement.

 I. Background

 Under the Communications Act of 1934, the Commission 
grants an application for a broadcasting license based upon 
its determination that "the public interest, convenience, and 
necessity will be served." 47 U.S.C. s 309(a). If the Com-
mission has before it two or more "mutually exclusive" appli-
cations--that is, applications of which only one can be granted 
because they seek the same license or different licenses for 

broadcasting stations that would interfere with each other--
then the Commission must hold a "comparative hearing" to 
consider the relative merits of the applications. See Ashback-
er Radio Corp. v. FCC, 326 U.S. 327, 333 (1945).

 The Commission periodically releases a public notice listing 
applications newly accepted for filing, grouped by station so 
that it is apparent where there are mutually exclusive applica-
tions subject to a comparative hearing. During the period 
relevant to this litigation, such public notices were released 
only in the Commission's press office in Washington, D.C.; 
they were neither mailed to the listed applicants nor publish-
ed by the Commission in any other form. At some point after 
release of the public notice, the Commission, as required by 
statute, "formally designate[s] the application for hearing ... 
[and] forthwith notif[ies] the applicant." 47 U.S.C. s 309(e). 
Specifically, the Commission issues a hearing designation 
order (HDO) giving the time and place of the hearing and 
setting forth issues to be heard, which it mails to each 
affected applicant. See 47 C.F.R. s 1.221(a)-(b).

A. The Hearing Fee Deadline Rule

 In 1986 the Congress added s 8 to the Communications 
Act, 47 U.S.C. s 158, instructing the Commission to assess 
and collect a substantial fee from each applicant subject to a 
comparative hearing. See Consolidated Omnibus Budget 
Reconciliation Act of 1985, Pub. L. No. 99-272, s 5002(e), 100 
Stat. 82, 118 (1986) (COBRA). The Commission was autho-
rized to "prescribe appropriate rules and regulations to carry 
out" the fee program, 47 U.S.C. s 158(f), and to dismiss 
applications for "failure to pay [the fee] in a timely manner," 
id. s 158(c)(2).

 The Commission first promulgated a rule establishing the 
deadline for payment of the comparative hearing fee in 1987. 
At that time, the Commission opined that "[t]he relevant 
legislative history indicates that [the hearing fee] should be 
levied when an application is designated for hearing." See 
Establishment of a Fee Collection Program, 2 F.C.C.R. 947, 
p 138 (1987) (citing H.R. Conf. Rep. No. 99-453, at 427 
(1985)). The Commission therefore tied the fee deadline to 

the formal act of designating an application for hearing: Each 
applicant was required to pay the hearing fee within 20 days 
of the Commission's mailing the HDO to that applicant. See 
id. at p p 144, 157. Thus, under the 1987 rule, an applicant 
whose application had been designated for hearing received 
personal notice from which the applicant--provided it knew 
the deadline rule--could determine when the hearing fee was 
due.

 In 1990 the Commission decided to move the time for 
payment of the hearing fee to an earlier stage in the compar-
ative process; it did so in order to promote earlier settle-
ments by weeding out non-serious applicants and by encour-
aging the serious ones to settle before the hearing fee was 
due. See Proposals to Reform the Commission's Compara-
tive Hearing Process to Expedite the Resolution of Cases, 
Report and Order, 6 F.C.C.R. 157, p 4 [Report & Order]; see 
also 47 U.S.C. s 158(g) (1990) (setting comparative hearing 
fee at $6,760 for 1990). The Commission again considered 
the remark in the conference report on the COBRA linking 
the hearing fee to formal designation of the application for 
hearing, but concluded this time that the remark was descrip-
tive rather than prescriptive; the Congress did not intend to 
limit the Commission's discretion over when to require pay-
ment. See Report & Order, 6 F.C.C.R. 157, p 6 n.8. The 
Commission then adopted its current approach to setting the 
deadline for payment, under which the deadline is tied to the 
release of the public notice rather than to formal designation 
of the application for hearing and the mailing of the HDO:

 In addition to announcing the acceptance of mutually 
 exclusive applications and establishing a date for the 
 filing of petitions to deny such applications, the public 
 notice ... will also announce the date on which all 
 mutually exclusive applicants will be required to pay the 
 hearing fee.
 
47 C.F.R. s 73.3573(g)(2)(i). The new rule makes no provi-
sion for personal notice to the applicant of the deadline for 
paying the fee.

 The practical effect of the 1990 rule is that once one files an 
application with the Commission, one must monitor the Com-
mission's public notices in order to determine when one's 
application has been accepted for filing and whether a mutu-
ally exclusive application has been accepted; if so, then there 
will be a comparative hearing, a hearing fee, and a deadline 
for paying the fee. If one misses the relevant public notice, 
then the payment deadline could pass--and one's application 
be dismissed--before one receives personal notice (in the 
HDO) that a hearing is necessary.

B. Lakeshore's Application 

 On January 19, 1993 Lakeshore applied to the Commission 
for a permit to construct a new FM broadcast station to 
operate on channel 229A. On April 9, 1993 the Commission 
released at its Washington, D.C. press office Public Notice 
NA-168, reporting the acceptance of five mutually exclusive 
applications for channel 229A, including Lakeshore's. See 
Notice of Acceptance for Filing of FM Broadcast Applica-
tions and Notice of Petitions to Deny and Hearing Fee 
Deadlines, Mimeo No. 32634. The Public Notice also stated 
that Lakeshore and its rivals were each required to pay the 
$6,760 hearing fee "no later than June 11, 1993, or the 
application will thereafter be dismissed." Id.

 When June 11 arrived the other four applicants had paid 
their hearing fees but Lakeshore had failed to do so. By 
letter dated August 3, 1993 the Commission staff therefore 
dismissed Lakeshore's application. In response, Lakeshore 
tendered a check in the amount of the hearing fee, along with 
a petition requesting reconsideration of the dismissal or waiv-
er of the deadline and reinstatement of its application. The 
staff denied Lakeshore's petition in 1995, and in 1998 the 
Commission denied Lakeshore's application for review. See 
In re Application of Lakeshore Broadcasting, Inc., 13 
F.C.C.R. 19062.

 II. Analysis

 Lakeshore challenges the dismissal of its application, first, 
on the ground that the 1990 deadline rule violates the Com-

munications Act of 1934 by requiring payment of the hearing 
fee before an application has been formally designated for 
hearing. Second, Lakeshore claims the dismissal of its appli-
cation violates the Commission regulation precluding enforce-
ment of an unpublished requirement against a party that has 
not received actual notice thereof. Third, Lakeshore argues 
that the dismissal violates its fifth amendment right to due 
process, both because Lakeshore was not given personal 
notice of the deadline and because the published rule does not 
provide fair notice of what is required of an applicant. In the 
alternative, Lakeshore challenges as unreasonable and dis-
criminatory the Commission's denial of its petition for waiver 
of the deadline and reinstatement of its application.

A. The Communications Act of 1934

 As mentioned above, Lakeshore claims that the Commis-
sion's deadline rule violates the Communications Act of 1934 
because it requires payment of the hearing fee prior to formal 
designation of the application for hearing. Under s 8 of the 
Act, as added by the COBRA in 1986, the Commission is 
required simply to "assess and collect" a charge for a compar-
ative hearing; the time for its payment is not specified. The 
conference report accompanying the 1986 legislation, howev-
er, describes the hearing fee as "[t]he charge levied when an 
application is designated for hearing." H.R. Conf. Rep. No. 
99-453, at 427 (1985). Lakeshore therefore argues that the 
Congress expressed its intention that the hearing fee not be 
levied--let alone made payable--before an application is for-
mally designated for hearing.

 Because the Congress committed administration of the Act 
in general, and of s 8 in particular, to the Commission, see 47 
U.S.C. ss 154(i) and 158(f), Lakeshore's challenge to the 
agency's statutory authority is governed by the two-step 
analysis of Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 
(1984). Under Chevron step one, we ask "whether Congress 
has directly spoken to the precise question at issue." Id. at 
842. If so, then we "must give effect to the unambiguously 
expressed intent of Congress." Id. at 843. If not, then 
under Chevron step two we will defer to the agency's inter-

pretation of the statute if it is reasonable in light of the text, 
the structure, and the purpose of that enactment. See id.

 As for Chevron step one, we cannot say that the Congress 
has spoken to the issue and made the hearing fee payable 
only after the application is formally designated for hearing. 
Clearly, s 8 itself is silent on the question when the hearing 
fee must be paid; it requires only that "the Commission shall 
assess and collect application fees." Nor does the apparent 
purpose behind s 8--to recapture the costs of regulation--
have any implication for what the Congress must have intend-
ed with respect to the deadline for paying the hearing fee to 
cover those costs. Finally, the conference report contains no 
evidence at all that the Congress intended to preclude the 
Commission from changing the timing of payment. The 
relevant fragment is: "2.c. Hearing Charge--The charge 
levied when an application is designated for hearing." H.R. 
Conf. Rep. No. 99-453, at 427 (1985). This description ap-
pears only in the legislative history, not in the statute itself; 
moreover, it is but an entry in a list describing 80 different 
fees being newly imposed by the Congress in the COBRA. 
We will not, based upon nothing more than this itemization in 
the conference report, attribute to the Congress a definitive 
intent upon a subject as to which the statute itself is silent.

 With respect to Chevron step two, the important feature of 
the present rule is that it ties the time for payment of the 
hearing fee to the Commission's acceptance of mutually exclu-
sive applications. That event marks the beginning of a 
process that will, unless the applicants settle, lead inexorably 
to a comparative hearing. See Report & Order, 6 F.C.C.R. 
157, p 6. Considering that the Act directs the Commission to 
"assess and collect" a fee for such a hearing, we can hardly 
say it is unreasonable for the Commission to demand pay-
ment of the fee when the hearing first becomes necessary, 
rather than waiting for the formality of the HDO in which the 
hearing is scheduled and the issues are set out. We conclude 
that the Commission's current rule on the hearing fee dead-
line reflects a reasonable interpretation of s 8 of the Commu-
nications Act.

B. The Notice Regulation

 Lakeshore also challenges the dismissal of its application as 
a violation of the Commission's regulation governing the use 
of unpublished materials, 47 C.F.R. s 0.445(e), which pro-
vides:

 If [adjudicatory opinions and orders of the Commission, 
 texts adopted by the Commission or a member of its 
 staff, rulemaking documents, and certain formal policy 
 statements and interpretations] are published in the Fed-
 eral Register, the FCC Record, FCC Reports, or Pike 
 and Fischer Radio Regulation, they may be relied upon, 
 used or cited as precedent by the Commission or private 
 parties in any manner. If they are not so published, 
 they may not be relied upon, used or cited as precedent, 
 except against persons who have actual notice of the 
 document in question or by such persons against the 
 Commission. No person is expected to comply with any 
 requirement or policy of the Commission unless he has 
 actual notice of that requirement or policy or a document 
 stating it has been published as provided in this para-
 graph.
 
According to Lakeshore, the June 11, 1993 fee deadline for its 
application is a Commission requirement that was not pub-
lished as provided in the quoted regulation; therefore, Lake-
shore, not having had actual notice of the deadline, cannot be 
required to comply with it.

 The Commission responds that s 0.445(e) requires publica-
tion or actual notice only of the deadline policy, not of every 
deadline established pursuant to that policy. Because the 
final rule promulgating the deadline policy was published in 
the Federal Register, see 56 Fed. Reg. 787, 796 (Jan. 9, 1991), 
s 0.445(e) has been satisfied and the deadline can be enforced 
against Lakeshore without publication or actual notice of the 
specific deadline by which it had to pay the hearing fee.

 Even without the substantial deference we show to an 
agency's interpretation of its own regulations, see Udall v. 
Tallman, 380 U.S. 1, 16-17 (1965); Jersey Shore Broadcast-

ing Corp. v. FCC, 37 F.3d 1531, 1536 (D.C. Cir. 1994), we 
would accept the Commission's interpretation of s 0.445(e) as 
having been satisfied by publication of the deadline policy in 
the Federal Register. The regulation on its face authorizes 
the agency to enforce a published policy, which necessarily 
leaves to the individual regulatee the burden of knowing that 
policy and how it applies to that regulatee.*

C. Due Process: Herein of Personal Notice and of Fair 
 Notice

 Lakeshore claims that dismissal of its application on the 
facts of this case violates its constitutional right to due 
process. Specifically, Lakeshore claims that the due process 
clause requires the Government to give adequate and effec-
tive notice of any proceeding that will adversely affect the 
property or liberty interest of a party thereto, and that 
public--as opposed to personal--notice is inadequate where 
the affected party is known to the Government. See Men-
nonite Board of Missions v. Adams, 462 U.S. 791, 800 (1983); 
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 
314-15 (1950). Because the Commission knew Lakeshore's 
identity and knew that its application would be dismissed if it 
failed to meet the deadline, Lakeshore claims the Commission 
was required to give it personal notice of the fee deadline.

 Assuming for the sake of the argument that Lakeshore was 
deprived of a liberty or property interest by dismissal of its 
application, we hold that public notice was all the process that 
Lakeshore was due. See Brenner v. Ebbert, 398 F.2d 762, 
765 (D.C. Cir. 1968) (assuming property interest at stake and 
denying due process challenge because notice was adequate). 
The premise of Lakeshore's constitutional argument appears 
to be that it had no notice at all of the payment deadline, but 
that is not so. Lakeshore "received, or should have received, 
notice ... in the most obvious way of all: by reading the 
regulations." General Electric Co. v. Environmental Protec-
tion Agency, 53 F.3d 1324, 1329 (D.C. Cir. 1995). Had 

__________
 * Lakeshore does not claim that it did not have "actual notice of 
... a document stating [that the deadline rule] has been published 
as provided in this paragraph." 47 C.F.R. s 0.445(e).

Lakeshore simply read the Commission's regulations, it would 
have known how to determine and satisfy the deadline for 
paying its hearing fee. The Commission promulgated the 
1990 deadline rule more than two years before Lakeshore 
filed its application. The rule had been the subject of a notice 
and comment rulemaking, see Report & Order, 6 F.C.C.R. 157 
(1990), had been published in the Federal Register, see 56 
Fed. Reg. 787, 796 (Jan. 9, 1991), and had been placed in the 
Code of Federal Regulations, see 47 C.F.R. s 73.3573. The 
rule unambiguously notified each prospective applicant, in-
cluding Lakeshore, that the public notice announcing that its 
application had been accepted for filing "will also announce 
the date on which all mutually exclusive applicants will be 
required to pay the hearing fee." Id.

 The Commission's published regulations also notified pro-
spective applicants how to obtain the public notice: "A limited 
number of copies of ... public notices of Commission actions 
[ ] and other public releases [are] made available at the Press 
and News Media Division when they are issued. Back issues 
of public releases are available for inspection in this office." 
Id. s 0.422. Finally, the Commission's published regulations 
notified the prospective applicant that failure to pay the fee in 
a timely manner would result in the dismissal of its applica-
tion. See id. s 1.1110 (1993), recodified at id. s 1.1112.

 The Commission's regulations clearly put Lakeshore on 
notice that once it filed an application it would be required to 
monitor the Commission's public notices as they were re-
leased in the Commission's Washington press office. This is 
not an unreasonable burden to place upon an applicant. 
Lakeshore was not required to monitor public notices on a 
daily basis: The minimum period between the issuance of a 
public notice and the hearing fee deadline was 60 days, see id. 
s 73.3573(g)(2), and the Commission maintained back issues 
of public notices for inspection at its Washington office, see id. 
s 0.422. Therefore, Lakeshore could safely have checked the 
public notices as infrequently as every 45 or 50 days. The 
Commission also represented at oral argument that at the 
relevant time all public notices were indexed by applicant 
name in the FCC Daily Digest, thus further reducing the 

effort required to monitor the status of one's application. 
True, the 1990 deadline rule requires an applicant to bear a 
greater burden of diligence than would a rule that provided 
for personal notice of the deadline. Lakeshore adduces no 
principle of due process, however, that precludes the Commis-
sion, by a duly published rule, from transferring this burden 
to the prospective licensee.

 Mullane and its progeny, urged upon us by Lakeshore, 
require no different result. Those cases were concerned with 
notice to parties who had no reason even to know there was 
pending a proceeding that could result in deprivation of their 
property interest. Lakeshore is in a fundamentally different 
position: as an applicant before the Commission, it had 
initiated the application process and knew or should have 
known that its application was subject to dismissal if it failed 
to abide by the Commission's various regulations for the 
submission and prosecution of an application. By filing its 
application, Lakeshore did not become entitled, as a matter of 
due process, to personal notice of all existing regulatory 
requirements that might affect its application; rather, the 
burden was upon Lakeshore to read and to comply with the 
agency's published regulations.

 Upon these facts, notice by publication of the rule, without 
personal notice of the individual applicant's deadline, is con-
sistent with Mullane. Therefore, Lakeshore's claim of inade-
quate notice reduces to its argument that the Commission's 
publication of the deadline rule "did not give adequate notice 
of the substance of its new rules." Although it is unclear 
whether Lakeshore premises this "fair notice" claim upon the 
due process clause, see, e.g., General Electric Co. v. Environ-
mental Protection Agency, 53 F.3d 1324, 1328 (D.C. Cir. 
1995), or upon the Administrative Procedures Act, see, e.g., 
Satellite Broadcasting Co. v. FCC, 824 F.2d 1, 3-4 (D.C. Cir. 
1987), Lakeshore correctly notes that this court has consis-
tently reversed Commission decisions dismissing applications 
where the Commission failed to provide "full and explicit 
notice of all prerequisites." Salzer v. FCC, 778 F.2d 869, 
871-72 (D.C. Cir. 1985); see also McElroy Electronics Corp. 
v. FCC, 990 F.2d 1351, 1358 (D.C. Cir. 1993); Satellite 
Broadcasting, 824 F.2d at 3-4; Radio Athens, Inc. (WATH) 

v. FCC, 401 F.2d 398, 401 (D.C. Cir. 1968). The Commission 
need not, however, have "made the clearest possible articula-
tion"; it is enough if "based on a 'fair reading' of [the rule, 
applicants] knew or should have known what the Commission 
expected of them." McElroy Electronics, 990 F.2d at 1358.

 Lakeshore claims that the deadline rule fails to provide 
fair notice that an applicant would not receive a personal 
notice of the deadline in addition to the public notice. Under 
the 1987 deadline rule, applicants had received personal no-
tice before the fee deadline, in the form of the HDO. When 
the Commission first proposed moving the hearing fee dead-
line forward, it included a provision for personal notice. See 
Proposals to Reform the Commission's Comparative Hear-
ing Process to Expedite the Resolution of Cases, Notice of 
Proposed Rule Making, 5 F.C.C.R. 4050, p 8 (1990) ("the 
staff would send the applicants a pre-designation notice.... 
That notice would establish the date for filing notices of 
appearance and the hearing fee"). Although the Commission 
did not in the end adopt that provision, Lakeshore argues 
that a reasonable applicant would believe the agency would 
nonetheless continue to provide personal notice in addition to 
releasing the public notice. Therefore, according to Lake-
shore, a reasonable applicant would not be on notice, even if 
it had read the 1990 deadline rule, that it must "ferret out" 
the deadline by searching the public notices.

 We think that a fair reading of the 1990 deadline rule would 
put a reasonable applicant on notice that it must monitor the 
Commission's public notices in order to determine whether 
and when any hearing fee was due. The 1990 rule makes no 
mention of additional personal notice, see 47 C.F.R. s 73.3573, 
and the Report and Order adopting the final rule chose to 
announce the deadline in the public notice "as opposed to a 
date established in a pre-designation letter," i.e., as opposed 
to the proposed rule upon which Lakeshore seeks to rely. 6 
F.C.C.R. 157, p 6 (1990). In light of the Commission's rejec-
tion of the proposed rule and the unambiguous character of 
the final rule, a reasonable applicant would not sit back and 
await personal notice. We therefore conclude that the Com-
mission has satisfied its obligation to provide fair notice of 

what is required of an applicant in order to avoid dismissal 
for non-payment of its hearing fee.

D. Lakeshore's Petition for Waiver and Reinstatement

 Assuming its application was properly dismissed for failure 
to make timely payment, Lakeshore argues that the Commis-
sion abused its discretion when it denied Lakeshore's request 
for a waiver of the deadline. Proper consideration of a 
waiver request is particularly important insofar as the Com-
mission regulates through stringent general rules. See 
WAIT Radio v. FCC, 418 F.2d 1153, 1157 (D.C. Cir. 1969). 
To prevail upon this ground, however, Lakeshore must show 
that the Commission's reason for denying it a waiver of the 
deadline rule is "so insubstantial as to render that denial an 
abuse of discretion." WAIT Radio v. FCC, 459 F.2d 1203, 
1207 (D.C. Cir. 1972). This Lakeshore cannot do.

 In rejecting Lakeshore's petition for a waiver, the Commis-
sion expressly cited Lakeshore's failure to "establish[ ] good 
cause for waiver of the hearing fee deadline." In re Applica-
tion of Lakeshore Broadcasting, Inc., 13 F.C.C.R. 19062 
(1998); see also Letter from Marilyn McDermett, FCC Asso-
ciate Managing Director, to George R. Borsari, Jr. and Susan 
H. Rosenau 2 (Sept. 11, 1995) ("Lakeshore has not advanced 
any compelling or extraordinary circumstances that would 
warrant waiver of the hearing fee deadline"). Indeed, Lake-
shore's only proffered reason for its failure to pay the hearing 
fee on time is that public notice of the deadline was inade-
quate--the very point we have already rejected.

 In the alternative, Lakeshore argues that its waiver re-
quest was treated differently from those of two similarly 
situated petitioners, citing In re Nancy Naleszkiewicz, 7 
F.C.C.R. 1797 (1992), and Letter to Martin W. Hoffman, Esq. 
(Apr. 23, 1993) (Martin Hoffman). To prevail upon a claim of 
disparate treatment, Lakeshore must demonstrate that the 
Commission's action was "so inconsistent with its precedent 
as to constitute arbitrary treatment amounting to an abuse of 
discretion." New Orleans Channel 20, Inc. v. FCC, 830 F.2d 
361, 366 (D.C. Cir. 1987).

 In the challenged order, the Commission distinguished 
Nancy Naleszkiewicz because that case did not involve a 
waiver of the deadline for payment of a hearing fee; and it 
distinguished Martin Hoffman because that decision was 
based upon concern that dismissing the application of a 
Chapter 7 bankruptcy trustee could interfere with federal 
bankruptcy policy. At the same time, the Commission cited 
three other cases in which it denied waivers upon facts 
similar to those of the present case. See Lakeshore, 13 
F.C.C.R. at 19062 (citing East Coast Comm. L.P., 11 F.C.C.R. 
18221 (1996); Macon County Broadcasting, Inc., 8 F.C.C.R. 
8669 (1993); Gerald E. Davis & Joe Ann Dunn, 9 F.C.C.R. 
3016 (1994)).

 The Commission's action here does not appear to be at all 
inconsistent with precedent, let alone "so inconsistent ... as 
to constitute ... an abuse of discretion." New Orleans 
Channel 20, 830 F.2d at 366. Lakeshore pointed to a single 
instance in which the Commission waived the hearing fee 
deadline, and the Commission discussed the factual differ-
ences between that case and this, while noting three cases 
closer on point where it did not waive the rule. To require a 
waiver on these facts would be to "transform [an] isolated 
grant[ ] of [waiver] into a rule binding on the agency." Id.

 III. Conclusion

 When the Commission by rule adopted the practice of 
announcing the deadline for an applicant to pay the hearing 
fee in a public notice released prior to issuance of the HDO, it 
shifted to the applicant the burden of monitoring the progress 
of its application in order to keep abreast of procedural 
milestones. The rule is premised upon a reasonable interpre-
tation of the Commission's authority under the Communica-
tions Act to implement the hearing fee program, and the 
dismissal of an application for failure to comply with the rule 
neither violates the Commission's own regulations nor denies 
the applicant due process of law. We therefore reject Lake-
shore's challenges to the dismissal of its application. Because 
Lakeshore has presented no valid justification for its failure 

to pay by the deadline and has failed to demonstrate that it 
was treated more harshly than was any similarly situated 
applicant, we uphold the Commission's denial of Lakeshore's 
petition to waive the hearing fee deadline. The order of the 
Commission is therefore

 Affirmed.